# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETH WESTBURG and LAURIE LIPMAN,<br><br>  Plaintiffs,<br><br>vs.<br><br>GOOD LIFE ADVISORS, LLC, et al.,<br><br>  Defendants. | CASE NO. 18cv248-LAB (MDD)<br><br>**ORDER DENYING DEFENDANTS' MOTION TO STAY PENDING ARBITRATION [Dkt. 11]** |

This is a dispute between two investment advisors and the investment firms that previously employed them. Plaintiffs, the former advisors, allege that when they attempted to leave their employment, the companies held them "hostage" by, among other things, demanding a payment before releasing them to a competing firm. Plaintiffs sued for breach of contract and declaratory relief. The Defendants have filed a motion to stay proceedings pending arbitration. For reasons set forth below, that motion is **DENIED.**

## BACKGROUND

Plaintiffs Westburg and Lipman are investment advisors who were previously employed by Defendant Good Life Advisors, a SEC-regulated Registered Investment Advisor ("RIA") firm, and were Class D members of Defendant Good Life Management, the holding company for Good Life Advisors. Compl., Dkt. 1. at ¶¶4-5. The individual

Defendants, Conor Delaney and Courtnie Nein, are senior managers of those organizations. *Id.* at ¶¶6-7. As an RIA firm, Good Life is only permitted to provide fee-based, not commission-based, advisory services to its clients. Because it cannot provide commission-based services, it partners with an outside FINRA-registered company, LPL Financial, to do so. *Id.* at ¶13. Advisors who work for Good Life are registered both with the SEC, as investment advisors with Good Life, and with FINRA, as registered representatives of LPL Financial. Accordingly, advisors are regulated by the SEC when they are performing fee-based services through Good Life and by FINRA when they act through LPL Financial to perform commission-based services. Defendants Delaney and Nein are registered with FINRA, but Good Life itself is not.

When Plaintiffs registered with LPL, their FINRA registration form (Form U-4[1]) contained an arbitration clause providing: "I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm . . . that is required to be arbitrated under the rules, constitutions, or bylaws of [FINRA]." Delaney Decl., Dkt. 11-2 at 33 (Westburg), 49 (Lipman). The rules of FINRA, in turn, provide: "a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among . . . associated persons." FINRA Rule 13200(a). Plaintiffs were bound by both provisions when they signed their Form U-4. The forms signed by both Plaintiffs list the "Firm Name" as "LPL FINANCIAL LLC." Dkt. 11-2 at 20, 37. It is undisputed that there were no arbitration agreements between Plaintiffs and Good Life directly. Thus, the only possible arbitration agreement between the parties is the arbitration clause in the Form U-4 (and the accompanying arbitration agreement in the FINRA rules) that Plaintiffs signed when they registered with FINRA via LPL.

When Good Life originally solicited Plaintiffs to join the company as advisors, Good Life advertised that their advisors were able to "maintain ownership and control of their

---

[1] A "Form U-4 Uniform Application for Securities Industry Registration or Transfer" is a prerequisite to FINRA licensing.

| 1 | book of business without having to oversee or worry about office and compliance
| 2 | logistics." *Id.* at ¶13.  In exchange for taking on the office and compliance logistics that
| 3 | an independent advisor would normally bear, Good Life received a percentage of
| 4 | Plaintiffs' commissions and fees.  *Id.* at ¶17.  Things turned south in mid-2017, when
| 5 | Plaintiffs grew dissatisfied with their relationship with Good Life.  Among other complaints,
| 6 | Plaintiffs allege that they were not receiving adequate support from Good Life and that
| 7 | they had received very little profit sharing, despite Defendants' promises.  *Id.* at ¶35.  After
| 8 | an unsuccessful attempt to resolve the dispute informally, Plaintiffs informed Good Life
| 9 | that they intended to part ways in September 2017.  *Id.* at ¶37.  According to Plaintiffs,
| 10 | Good Life then attempted to "hold them hostage" by asserting an ownership interest in
| 11 | Plaintiffs' business clients based on a non-compete agreement that appears in the Good
| 12 | Life Management Operating Agreement, and refusing to let Plaintiffs go to another RIA
| 13 | firm without first paying a "ransom payment."  *Id.* at ¶39.

Plaintiffs sued seeking declaratory relief that they had not violated any provision of their agreement with Defendants, as well as monetary damages for misrepresentations Defendants made in soliciting them to join Good Life. Defendants responded by filing this motion to stay the case pending arbitration, based on the arbitration clause in Plaintiffs' Form U-4s.

## LEGAL STANDARD

Section 2 of the Federal Arbitration Act ("FAA") provides that:

> A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  The Supreme Court has interpreted this mandate broadly, holding that Section 2 "'declare[s] a national policy favoring arbitration of claims' that parties contract to settle in that manner." *Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (quoting *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)).  Under the FAA, a Court need consider only two

questions to determine whether to compel arbitration: (1) is there a valid agreement to arbitrate? And, if so, (2) does the agreement cover the matter in dispute? *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). While there is a general presumption in favor of arbitration, that presumption "does not apply 'if contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision.'" *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044–45 (9th Cir. 2009) (quoting *In re Tobacco Cases I, JCCP 4041*, 124 Cal. App. 4th 1095 (Cal. Ct. App. 2004).

Section 3 of the FAA provides that where an issue involved in a suit or proceeding is referable to arbitration under an agreement in writing, the district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. . . ." 9 U.S.C. § 3. The language is mandatory, and district courts are required to order arbitration on issues as to which an arbitration agreement has been signed. *Chiron Corp.* 207 F.3d at 1130.

## DISCUSSION

Defendants assert that by signing their Form U-4s with Good Life's affiliate LPL and thereby registering with FINRA, Plaintiffs have agreed to arbitrate their disputes with Good Life[2] under the FINRA Code. Plaintiffs argue that they have no arbitration agreement with Good Life and that the FINRA Code, which governs Plaintiffs' relationship with non-party LPL, does not apply to their relationship with Good Life. There is no dispute that there is no direct arbitration agreement between Good Life and Plaintiffs, nor that Plaintiffs signed the Form U-4s and thereby consented to the arbitration agreement in the FINRA Code, if applicable. The only question for the Court is whether Plaintiffs' allegations are within the scope of the FINRA arbitration clauses. The Court finds that they are not.

---

[2] Under the terms of the FINRA arbitration clauses, only Delaney and Nein would have standing to seek arbitration, as Good Life is not a FINRA member. The Court refers to all the Defendants as "Good Life" for simplicity.

- 4 -

The FINRA Code, which Plaintiff's agreed to be bound by when they signed their Form U-4, provides that "a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among . . . associated persons." FINRA Rule 13200(a). While apparently broad in scope, courts interpreting this provision have found that it "must have *some* limitation. It certainly cannot include the activities of every possible business enterprise in which an individual, who happens to be an 'associated person,' might be engaged." *Valentine Capital Asset Mgmt., Inc. v. Agahi*, 174 Cal. App. 4th 606, 615 (Cal. Ct. App. 2009) (emphasis in original). For example, a registered representative who happens to be a real estate agent might sell a home to another person who also happens to be a registered representative. A dispute arising from that sale would certainly be a dispute "between or among . . . associated persons" that "arises out of the business activities of a member," but it clearly falls outside the scope of the FINRA arbitration clause. *Id.* at 615-16.

There's no need to reinvent the wheel here, because the California Court of Appeal in *Valentine Capital* confronted and resolved practically the same issue. While that opinion is not binding on this Court, the Court finds its reasoning persuasive. In *Valentine Capital*, the defendants were former employees who worked for the plaintiff investment firm, Valentine, in various capacities. *Id.* at 608-09. Like Good Life in the present case, Valentine affiliated with an outside investment firm, Geneos, to provide FINRA-regulated services. *Id.* at 609. When defendants left Valentine to start their own investment firm, Valentine sued the former employees for, among other things, trade secret misappropriation. *Id.* The former employees moved to compel arbitration under the FINRA rules. *Id.* at 611. The court interpreted Rule 13200 to mandate arbitration only if the claims at issue "arise out of the business activities [of the parties] *as* associated persons of a FINRA member." *Id.* at 617 (emphasis in original). Looking to the claims at issue, which included trade secret misappropriation and breach of contract related to client ownership interests, the *Valentine* court found that the claims were outside the scope of the FINRA relationship. Importantly, there was "no allegation that any of the

parties were acting for any FINRA-member firm or as an associated person" and the "contracts at issue . . . were not signed on behalf of [the FINRA intermediary,] Geneos." *Id.* at 618. "None of the purported wrongdoing in either pleading is alleged to have occurred in the course of the parties' duties as associated persons with a FINRA-member firm; instead, it allegedly occurred in connection with investment advisory firms . . . who are not members of FINRA." *Id.*

Although the roles in the present case are swapped, the underlying facts are unusually similar to those in *Valentine*. In both cases, the FINRA intermediary (here, LPL; in *Valentine*, Geneos) is not a party to the current suit, but the parties attempt to use the individual advisors' registration with the intermediary as a hook to secure arbitration between the FINRA-registered advisor and the investment firm or its FINRA-registered officers. As in *Valentine*, the Court must look to the substance of the complaint to determine whether the claims alleged relate to the parties' status "as associated persons of a FINRA member." *Id.* at 617. Put another way, the FINRA arbitration mandate only applies if the "arbitration will pertain to matters with some nexus to the activity actually regulated by FINRA. . . . [A]ny other interpretation would wrongly strip individuals of their civil jury trial rights concerning subject matter in which FINRA maintains no regulatory interest." *Id.* at 616.

Here, the majority of Plaintiffs' claims plainly do not relate to "activity actually regulated by FINRA." *Id.* For example, their Second Claim for Relief simply seeks a declaration that provisions in the Operating Agreement they signed with Good Life are void as against public policy. Dkt. 1 at 15. Whether a contract signed between Plaintiffs and a non-FINRA-registered investment firm is void as against public policy has no relationship to FINRA-regulated activities. The same is true with respect to Plaintiffs' claims for breach of contract, breach of covenant of good faith and fair dealing, breach of fiduciary duty, and most of the remaining claims. Indeed, even of the claims that do not directly relate to the Operating Agreement, most relate to some sort of inducement Defendants offered to get Plaintiffs to join Good Life and sign the Operating Agreement.

Their claims for negligent and intentional misrepresentation, for example, relate to statements Good Life made to Plaintiffs prior to them joining the firm—including that they would retain full ownership rights to their book of business and would not have to sign non-compete agreements—that were made, in Plaintiffs' view, for the sole purpose of inducing them to join the firm and then forcing the Operating Agreement on them. *Id.* at 16-18. These claims are not relevant to "activity actually regulated by FINRA."

The only claim that comes close to qualifying is the one for declaratory relief. Plaintiffs seek a declaration that they did not violate the Computer Fraud and Abuse Act by taking "Client Information" when they left Good Life. *Id.* at 14. Defendants argue that this plainly relates to FINRA-regulated activity because, by Plaintiffs' own admission, "[t]his [client] information was solely obtained from LPL's record." Reply, Dkt. 15 at 6. If Plaintiffs had sued LPL for declaratory relief regarding this conduct, or vice versa, the claim would almost certainly be arbitrable under the FINRA Code. But it doesn't follow that a third party (like Good Life and its officers) would also be entitled to arbitration for this conduct. It's a close call, but the Court finds that this claim is not subject to arbitration because it is outside the scope of activity regulated by FINRA.

Defendants' arguments as to the arbitrability of Plaintiffs' other claims are unavailing. They argue that some of the allegations in Plaintiffs' complaint tangentially relate to work they did with LPL and are therefore within the scope of the FINRA arbitration provisions. For example, Plaintiffs allege that Good Life wrongfully withheld commissions that Plaintiffs were due under the Good Life Operating Agreement, and some of those commissions were based on LPL transactions. *Id.* at 7. While that may be true, it is not dispositive. The gravamen of Plaintiffs' claim is that Good Life breached the Operating Agreement by not paying Plaintiffs what they were owed under their contract; the source of the commissions is mostly irrelevant to that analysis. Again, the Court doesn't dispute that if Plaintiff brought similar claims against LPL, those claims might be arbitrable. But the mere fact that Plaintiffs acted through LPL in performing some of their transactions for Good Life does not render every aspect of their relationship with Good Life subject to

arbitration under the FINRA rules. If Good Life had intended claims like these to be arbitrable, it could have easily added an arbitration clause to the Operating Agreement that it required Plaintiffs to sign. Good Life didn't, and its attempt to shoehorn these claims into an arbitration clause between Plaintiffs and a non-party doesn't fly.

Plaintiffs' claims are not arbitrable and Defendants are not entitled to a stay pending arbitration. The parties dedicate a significant amount of their briefing to whether the "Good Life Entities" (as opposed to the FINRA-registered managers, Delaney and Nein) are also entitled to a stay, based on alter ego and equitable estoppel theories. Because the claims are non-arbitrable, the Court finds it unnecessary to reach that question.

## DISPOSITION

Defendants' Motion to Stay Pending Arbitration is **DENIED**. Defendants shall file their answer to Plaintiffs' complaint by **November 9, 2018**.

**IT IS SO ORDERED**.

Dated: October 18, 2018

**HONORABLE LARRY ALAN BURNS**
United States District Judge